# In the United States Court of Federal Claims

No. 09-865C

(Filed: April 3, 2013)

_____

| | |
|---|---|
| LAKESHORE ENGINEERING SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | * Contract case; Motion for summary judgment; <br> * ID/IQ contract, with fixed-price task orders; <br> * Use of price book with bidder's coefficient; <br> * Army neither contracted nor warranted that <br> * prices in price book accurately reflected local <br> * prices; Instructions for using price book <br> * included in solicitation by necessary <br> * implication; Risk of price understatement on <br> * contractor; No breach of the covenant of good <br> * faith and fair dealing; No mutual mistake or <br> * unilateral mistake; Reformation denied; <br> * Equitable adjustment denied. <br> * |

_____

**OPINION**

_____

*Phillip B. Abernethy*, Butler, Snow, O'Mara, Stevens and Cannada, PLLC, Ridgeland, MS, for plaintiff.

*Jane C. Dempsey,* Civil Division, United States Department of Justice, with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

This contract case is before the court on defendant's motion for summary judgment. Lakeshore Engineering Services, Inc. (Lakeshore or plaintiff) was awarded an Indefinite-Delivery/Indefinite Quantity contract to provide, via job orders, constructions services to the U.S. Army (the Army) at Fort Rucker, Alabama (Fort Rucker). The Solicitation for this contract anticipated that the price of task orders would be set by multiplying the prices in a specified pricing book by a bidder's coefficient. Lakeshore claims that it was misled by the Solicitation into believing that the prices in the pricing book accurately reflected local prices at Fort Rucker. It asserts that, instead, those prices significantly understated the costs of certain materials and that the various adjustment clauses in the contract failed to account for these differences. It claims that it is entitled to an equitable adjustment essentially equal to the difference between its

actual costs and the prices set under the contract. Finding that neither the terms of the contract, nor any implied warranties or covenants provide a basis for such an adjustment, the court hereby **GRANTS** defendant's motion for summary judgment and orders this case dismissed.

## I. BACKGROUND

In December 2006, the Army issued Solicitation Number W911SE-07-R-007-002 (the Solicitation) for an indefinite delivery/indefinite quantity, fixed price, job-order contract (the Contract) for repair, maintenance, and construction services in support of the Directorate of Public Works located at Fort Rucker. The job was to be conducted over one base year and four one-year options, for a total of five years. The contractor was to provide "all materials, supplies, job site supervision, labor, construction equipment, required safety equipment, barricades both lighted and unlighted, except that specified as Government-furnished, to repair, construct real property facilities and provide related work as specified, at Fort Rucker, AL, and satellite installations." The Solicitation indicated that the guaranteed minimum quantity of work under the Contract for task orders would be $300,000.

The Solicitation informed that the pricing portion of offers would take the form of three coefficients – one each for work during normal hours on pre-priced items; overtime work on pre-priced items; and non-pre-priced items. For the pre-priced items, the coefficient was to be "multiplied by the unit prices listed in a Universal Unit Price Book (UUPB) to price a job or project on individual job orders. According to the Solicitation, the coefficient was: "a numerical factor that represents costs (generally indirect costs) not considered to be included in the [UUPB] prices, e.g., general and administrative and other overhead costs, insurance costs, bonding and alternative payment protection costs, protective clothing, equipment rental, and contractor's profit." The Solicitation said the offeror's coefficient should account for a wide variety of risks of doing business,[1] adding at a later point, the coefficient "shall contain all allowable contractor costs, including contingencies and profit."[2] It further stated that the "offeror's coefficient shall

---

[1] These included, but were not limited to, the following: contractor's overhead and profit; insurance; bonding; taxes; licenses and fees; waste and excess materials; mobilization; compliance with environmental and safety laws; project management; and a variety of other overhead items.

[2] In this regard, the Solicitation further stated:

> Examples of such costs are: gross receipts taxes, payroll taxes (FICA, workmen's compensation, state and federal unemployment taxes for direct payroll employees, etc.), superintendents' salaries, builders' risk insurance, initial contract startup mobilization, demobilization expenses, and bond premiums. Offered coefficient shall also contain various overhead expenses, including, project estimating, site office overhead, field office building, furniture, equipment, on-site office staff salaries, vehicle and construction equipment maintenance, office administrative

contain all costs other than the pre-priced unit prices, as no allowance will be made after award."[3]  The Solicitation, however, allowed for adjustments in the coefficient for the option years, to be based on the Engineering News Record building Cost Index (BCI), in accordance with the Economic Price Adjustment Clause, Army Federal Acquisition Regulation Supplement (AFARS) 5152.237-9000.[4]

   The Solicitation designated the Gordian Group Construction Task Catalog (the Gordian Catalog) and PROGEN Online as the UUPB and accompanying software, respectively, to be "used by the contractor in development of price proposals for individual Task Orders." According to the Solicitation's technical specification, "[t]he UUPB, modified for Fort Rucker, contains pricing information (i.e., Government Estimate) for the description of work to be accomplished and for the units of measure specified." This segment further indicated that the "UUPB consists of Divisions 1 through 16 that are applicable to Divisions 1 through 16 of the Job Order Contract Technical Specifications." It additionally specified that the "UUPB modified for Fort Rucker contains unit pricing data to be used by the Contractor in development of price proposals for each work order," adding that "[t]he pricing data is presented as basic items and as price adjustment modifiers to the basic item."

---

   expenses, and a proportional share of home office overhead.  The coefficient shall also include all insurance, special clothing for workers, traffic barricades, additional supervision, as well as, paperwork fees associated with a particular delivery order, for example, asbestos removal plan, lead abatement plan, consultant fees, all on and off site storage, etc.

   [3]  The Solicitation indicated that items not listed in the UUPB (denominated "non pre-priced" or NPP) were to be "proposed in bare cost only (material, equipment and labor) multiplied by the quantity and the non pre-priced coefficient to arrive at the total price for the NPP." The coefficient for the NPP was to "include all items associated with performing the non-prepriced tasks other than bare costs."

   [4]  This clause describes the process for adjusting the coefficient for option years thusly:

   An economic adjustment will be applied to the contract coefficient(s) addressing changes in the cost of labor, equipment and material in the Unit Price Book (UPB) (this includes consideration of Davis Bacon issues).  This allows for economic increase or decrease of the prices in the UPB and serves to adjust line item prices by the percentage increase or decrease of the economic trend in the construction market.  The economic price adjustment will be based on the Building Cost Index (BCI) found in the Market Trend pages of the Engineering News Record (ENR).  The economic adjustment is not applied to the cost items comprising the coefficient.  No upward adjustment shall apply to task orders awarded prior to the effective date of the adjustment, regardless of the date of commencement of work thereunder.

The Solicitation specified how the contractor, in the technical portion of its proposal, was to demonstrate technical acceptability, including bonding capabilities, as well as provide information on contract management, technical staff ability, and comprehension of requirements. The last of these was to take the form of a detailed cost proposal based on information contained in a sample scope of work, including an explanation and breakdown of line items used from the UUPB and of any non-prepriced item included in the sample proposal. Offerors were also to provide information on relevant experience and past performance. The Army was to consider all of this information in evaluating the technical portion of the offers. The evaluation segment of the Solicitation further described the steps the Army would use to evaluate the offerors' price proposals, principally focusing on how the pre-priced coefficient would be examined. For this purpose, the Solicitation made various assumptions, *e.g.*, that $4 million would be the notional requirement for the base year,[5] that certain amounts of work would be performed in other than normal working hours, etc. The Solicitation indicated that "award will be made to the lowest priced offeror who is technically acceptable."

The Solicitation had five attachments, including "ATCH 2 – Progen Unit Price Book (UPB), Divisions 1 through 16." These divisions of the Gordian Book, which covered a wide range of construction activities,[6] were attached to the Solicitation in the form of two volumes. Each volume opened with a table of contents, both of which listed an introductory section numbered "0000," entitled "Using The Construction Task Catalog." This introductory section, repeated in each of the two volumes attached to the Solicitation, explained that "this catalog was created specifically for Fort Rucker, Alabama, and published in December 2006," and the unit prices included labor costs, equipment costs, and material costs. The section listed costs that the unit prices did not encompass and which, therefore, were to be included in the contractors' coefficient.[7] This description was similar, but not identical, to that in the Solicitation itself. Specifically, the book's discussion of business risk stated that the coefficient should include "business risks such as the risk of a lower than expected volume of work, smaller than anticipated Job Orders, poor Subcontractor performance, and inflation or material cost fluctuations."

---

[5]  Regarding the $4 million, the Solicitation was quick to add that "[t]his figure is for prepriced coefficient evaluation only and may not reflect the actual dollar amount of projects delivered during the contract period."

[6]  Among the areas covered were site work, concrete, masonry, metals, wood and plastic, thermal and moisture protection, doors and windows, finishes, specialties, equipment, furnishings, special construction, conveying systems, mechanical, and electrical. Within each of these chapters, there were hundreds and, in some instances, thousands of items.

[7]  The section referred to the coefficient as an "Adjustment Factor."

This same section of the Gordian Book warned that:

> Contractors may find differences in labor, equipment material costs due to certain economic factors. Variations in labor cost can also result from labor efficiency, labor restrictions, working conditions and local work rules. Variations in material costs can also result from the quantity of material purchased, the existing relationship with suppliers, and because the materials have been discontinued or have become obsolete.

Based on these caveats, the section proceeded to state that: "[w]hile diligent effort is made to provide accurate and reliable up-to-date pricing, it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." Like the Solicitation, the Gordian Book provided that the list of costs to be included in the coefficient was "not exhaustive" and that "no additional payments of any kind whatsoever will be made," adding again that "[a]ll costs not included in the unit prices must be part of the Adjustment Factors."[8]

In March, 2007, Lakeshore submitted its offer to the Army, with a coefficient of 1.28 for normal working hours, 1.46 for overtime working hours, and 1.22 for non pre-priced items. In its offer, Lakeshore indicated that it "agrees with all terms, conditions, and provisions included in this solicitation." It represented that it was, at that time, the prime contractor on five similar contracts, and had, in the prior five years, completed more than 1,500 task orders valued at more than $100 million. In its pricing proposal, Lakeshore explained the breakdown of its coefficient. In a segment entitled "Our Perception of Unit Price Book (UPB), it represented –

> We have thoroughly reviewed the UPB and compared major line items with our actual cost experience on past projects. Overall the UPB prices are less than our actual past cost experience.

In a segment entitled "Development of Coefficient and Basis of Cost," Lakeshore further indicated that –

> In order to develop the coefficient, we decided to perform a sample analysis of the cost factors for a known past renovation project. We provided the scope of work to our major subcontractors and obtained their prices. Similarly, our in-house estimator prepared an estimate based on Unit Price Book.

---

[8] Although Section 00 was not specifically referenced in the Solicitation, the sections that are referenced therein make references to this section. For example, on the opening page of Section 01, the book includes a note defining "reimbursable Fees," which states that they "include but are not limited to permits, special inspections, special insurance, additional warranties, etc., which are not included in a task or an Adjustment Factor as explained in the Contract or The Construction Task Catalog®."

Lakeshore provided an exhibit summarizing the results of this internal exercise, which examined, *inter alia*, the "'sensitivity' of the coefficient if workload varies." It represented that the weighted average of coefficients under this exercise was 1.295, leading it to propose a coefficient of 1.28 for normal working hours at Fort Rucker. The proposal contained a similar set of representations regarding plaintiff's study of overtime hours, leading it to propose a coefficient of 1.46 for overtime hours at Fort Rucker.

On April 26, 2007, the Army awarded the Contract to Lakeshore. The Contract included all terms, conditions and provisions set forth in the Solicitation. In the base year, Lakeshore performed 79 construction delivery orders, the first of which was issued on July 25, 2007. For each of these orders, the parties followed the same process: the Army requested Lakeshore to submit a detailed cost estimate for the proposed work based upon the unit prices in the Gordian Book. After receipt of those estimates, the Army compared them to its own cost estimate and the parties then conducted negotiations regarding what was needed to complete the work. The parties then executed a delivery order, each of which provided "a Firm Fixed-Price for the performance of the work described," as specified in the Contract.

On April 27, 2008, the Army awarded the first option year to Lakeshore. Pursuant to the economic price adjustment clause, the coefficient factors were adjusted upward by four percent, such that the coefficient factor for normal working hours became 1.32. During that contract year, Lakeshore performed 74 construction delivery orders. Each of these orders were generated using the process described above.

On March 10, 2009, plaintiff filed a claim for equitable adjustment with the contracting officer (CO) pursuant to the Contract Disputes Act of 1978 (the CDA), 41 U.S.C. § 601, *et seq.*, seeking recovery of $1,996,152.40 for losses it incurred performing in the base year and first option year. The claim alleged that Lakeshore had lost "a tremendous amount of money because it was compelled to perform under the [Contract] utilizing the Gordian UPB pricing schedule." On June 25, 2009, the CO issued a final decision denying recovery. On December 15, 2009, plaintiff filed its complaint in this court, which was amended on April 19, 2011. Defendant filed its motion for summary judgment on January 13, 2012. Briefing and oral argument on that motion have been completed.

## II.    DISCUSSION

We begin with common ground. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id.* at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

Lakeshore argues that the United States breached the Contract and its implied duty of good faith and fair dealing by: (i) not utilizing a price index that fairly and accurately reflected local rates for labor, materials, and equipment; (ii) not allowing adjustments to that index for "extraordinary inflationary circumstances;" and (iii) not adjusting the first option-year coefficient in a way that complied with the contract's requirements. Plaintiff further alleges that the United States breached an implied warranty that the Contract specifications would be free from error by using the UUPB. Finally, plaintiff argues that either the parties entered into the Contract as a result of mutual mistake of fact – a mistaken belief that the UUPB was accurate for Fort Rucker – or that Lakeshore entered into the Contract as a result of this mistake, and that the government knew or should have known of Lakeshore's mistake. The court will consider these claims *seriatim*.

Most of plaintiff's pricing claims begin – and end – with the provisions of the Contract. To determine what that agreement reveals, we begin, as we must, with the Contract's plain language. *Banknote Corp. of Am. v. United State*s, 365 F.3d 1345, 1353 (Fed. Cir. 2004); *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). "If the provisions of the [contract] are clear and unambiguous," the Federal Circuit has stated, "they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." *Banknote Corp.*, 365 F.3d at 1353. In addition, a contract should be interpreted in a manner that harmonizes and gives reasonable meaning to all its parts. *Id.* "Provisions of a contract must be so construed as to effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *see also Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999). An interpretation that gives a reasonable meaning to all provisions of a contract thus is preferable to one that leaves a portion of it useless or inexplicable. *Gould, Inc.*, 935 F.2d at 1274; *see also Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 537-38 (2011); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 707-08 (2010). Context thus defines the meaning of any given term or provision in a government

contract.  *Id.* at 708 (citing *Metric Constructors*, 169 F.3d at 752); *see also Fulcra Worldwide*, 97 Fed. Cl. at 537-38.

In various ways, Lakeshore complains that the Army utilized a pricing book that did not reflect local prices, particularly after Hurricane Katrina.  However, Lakeshore cannot point to anything in the Solicitation or resulting contract that indicates that the Army ever assumed the obligation to provide offerors with accurate local prices, or the economic consequences if one or more prices in the guide proved inaccurate.  The Contract made clear that the coefficient was to reflect "risks of doing business" and that this figure "shall contain all costs other than the pre-priced unit prices, as no allowance will be made after award."  Moreover, the Gordian Book used under the Contract flatly warned prospective offerors that while Gordian used "diligent effort . . . to provide accurate and reliable up-to-date pricing, it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly."  That same book further cautioned that the coefficient should include business risks such as "inflation or material cost fluctuations."  Plainly, these provisions should have put plaintiff on notice that it, and not the Army, bore the risk that the prices in the Gordian Book might be too low – a possibility that plaintiff could have accounted for by examining the prices in the book and setting its coefficient appropriately.

Lakeshore, for its part, stresses that the caveats regarding the accuracy of the prices made in the Gordian Book were in an introductory segment to that publication that was not specifically incorporated into the Solicitation.  Plaintiff, of course, is right that the Solicitation explicitly refers to all of the chapters in the Gordian Book save the introductory chapter that describes how to use the book (Chapter 0000), within which are the various caveats regarding the accuracy of the prices listed in the book.  The court, however, does not believe this makes a difference here for several reasons.

First, it is reasonable to believe that when the Solicitation incorporated by reference the other chapters in the Gordian Book, it incorporated, by necessary implication, the instructions in the introduction regarding how to use those chapters.  Those instructions were extensive and essential to the use of the book, providing detailed information regarding:  (i) what was and was not included in various unit prices; (ii) the extent to which the unit prices included, *inter alia*, delivery, movement of material, imported materials (*e.g.*, sand and soil), fasteners, and testing and calibration; and (iii) what was and was not covered in terms of demolition costs.  The instructions also provided a detailed explanation of what was covered by the coefficient, in terms of business costs and construction-related cost; it was within this segment, under the title of "Price Variations," that readers would find the passages warning about the accuracy of price information and the need for contractors to verify the prices contained in the book.  Lastly, the introduction provided a series of "General Interpretations" to be applied in using the prices in the catalog, including instructions on how to calculate quantity discounts; how to choose between alternative tasks to accomplish the same purpose; how to deal with situations in which the catalog specified materials or equipment by reference to specific manufacturers or vendors; how to construe the various specifications for tasks; and how to apply the units of measure employed throughout the book.  All told, these instructions went on for eight detailed pages, making it

inconceivable that anyone could appropriately or effectively use the Gordian Book without referring repeatedly back to these provisions.

Given the organization of the Gordian Book, the court must conclude that in incorporating the chapters containing the pricing information, the Solicitation necessarily incorporated the instructions needed to interpret that information. *See Lusk v. Lyon Metal Prods.*, 247 S.W.2d 617, 621-22 (Mo. 1952) (contract incorporated by necessity portions of pricing manual that were needed to effectuate the provisions of the manual that were specifically referenced in the contract); *see also Johnston Bros v. Village of Coopersville*, 246 N.W. 551, 552 (Mich. 1932) (contract included unreferenced, but attached, printed matter regarding pump warranties because "[t]he contract without such matter is incomplete"). The instructions to the Gordian Book could not be clearer in indicating that "it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." Plainly, plaintiff understood this. In its pricing proposal, it represented that it had "thoroughly reviewed the UPB and compared major line items with [its] actual cost experience on past projects" and had determined that "[o]verall the UPB prices are less than our actual past cost experience." It further averred that, in developing its coefficients, it had "perform[ed] a sample analysis of the cost factors for a known past renovation project" and "provided the scope of work to [its] major subcontractors and obtained their prices." Indeed, in deposition testimony, one of Lakeshore's officials admitted that he had conducted a side-by-side comparison of the 2005 and 2006 Gordian Books. While the record suggests that some of the representations made by plaintiff in its proposal may have been puffery, it remains clear that plaintiff understood that there was a relationship between the accuracy of the prices in the Gordian Book and what it should bid in terms of a coefficient. It should not be heard to argue otherwise now, after-the-fact, when it is convenient to do so.[9]

Plaintiff's vaunted attempts to place the risk of pricing errors entirely on the shoulders of the Army cannot be reconciled with several of the Contract's provisions. The first, of course, are those indicating that this was a fixed-price contract, including one provision that, in describing how task orders would be issued, explicitly stated "[t]he Task Order is a Firm Fixed-Price for the performance of the work described." Consistent with this intent, the Contract does not contain any of the Federal Acquisition Regulation provisions that typically would be used by a

---

[9] Plaintiff complains that it "would have been impossible to verify the unit prices" in the Gordian Book, noting that it did not know what the future task orders would be and thus did not have time to review all 70,000 unit prices listed in the book. But, plaintiff, of course, did attempt to verify the prices it believed were most important to its success under the Contract. As was said in *ConocoPhillips v. United States*, 501 F.3d 1374, 1379 (Fed. Cir. 2007), in which the plaintiff complained that the contract contained an index for fuel that did not reflect market prices: "[i]f the plaintiffs had felt that a different method of adjusting market prices would be more appropriate and if the issue was sufficiently important to them, they could have objected to the use of the [index]; if the government had insisted on using the [index], they could have declined to enter into the contracts."

contracting officer to analyze the allowable costs under a cost-reimbursement arrangement. *See, e.g.*, 48 C.F.R. §§ 16.307 (cost-reimbursement contracts); 52.216-7 (allowable cost and payment clause). Without such guidance, plaintiff simply would have this court award it the difference between what it expended and what it charged under the Contract – effectively guaranteeing it a profit, albeit without any mention of correlating adjustments for instances in which the price in the Gordian Book exceeded plaintiff's actual cost. There is no reason to believe that the Contract was intended to "bind the government to such a one-sided arrangement." *ConocoPhillips*, 501 F.3d at 1379. Second, the Contract quite explicitly indicates that the coefficient was designed to deal with a variety of business risks.[10] It provided a formula for adjusting the coefficient to deal with changes in the cost of equipment, labor, and materials, and stressed that no other "allowance will be made after award." These provisions are consistent with a fixed-price contract, under which the contractor "assumes the risk of unexpected costs." *ITT Arctic Servs. v. United States*, 524 F.2d 680, 691 (Ct. Cl. 1975); *see also Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1579 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 951 (1998). All these provisions would be rendered surplusage if, beyond the compensation specified in the Contract, the contractor were entitled to an adjustment to account for costs in excess of the prices listed in the Gordian Book. These provisions, rather, made clear that Lakeshore bore the risk of cost increases or unanticipated inflation, which it was to consider in setting its coefficient.[11] This court will not imply into the contract provisions that contradict those actually contained therein. *See Gardiner, Kamya & Assocs. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (requiring the court to "interpret [a contract] as a whole and 'in a manner which . . . avoids conflict'"); *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997).

Nor can plaintiff reach the same point, economically-speaking, by asserting instead that defendant, by failing to adjust the prices, breached the covenant of good faith and fair dealing. Having explicitly agreed to the provisions in the Contract dealing with pricing, plaintiff cannot now contend that defendant violated the covenant of good faith and fair dealing merely by enforcing the same. To be sure, a breach of the good faith covenant can be established by a showing that defendant "specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). While plaintiff may show a breach of the covenant without

---

[10] Plaintiff would limit these business risks to those specifically listed in the Solicitation and notes that the listed risks did not include the risk that the prices in the 2006 Gordian Book were wrong. However, the Solicitation indicated that the risks to be factored into the bidder's coefficient included, but were "not . . . limited to" the business risks listed.

[11] Notably, some contracts contain adjustment provisions for unanticipated inflation. *See, e.g.*, *Brunswick Corp. v. United States*, 951 F.2d 334, 335 (Fed. Cir. 1991). Unfortunately for plaintiff, this one did not.

demonstrating a corresponding violation of the underlying agreement,[12] it cannot do so without some evidence that defendant acted "'to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Info. Sys. & Networks,* 81 Fed. Cl. at 740 (quoting *Centex*, 395 F.3d at 1304); *see also Mkt. St. Assocs., L.P. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) (Posner, J.) (indicating that a breach of the covenant occurs when there has been "sharp dealing"); *Dobyns v. United States*, 91 Fed. Cl. 412, 421 (2010). Here, there is no such evidence – unless one accepts plaintiff's argument that bad faith is exhibited by defendant's failure to grant plaintiff the equitable adjustment in question. This court, however, is not prepared to turn the covenant analysis into a syllogism, in which a breach of the covenant occurs any time the government refuses to make whole a contractor that performs a contract at a loss.[13]

Contrary to plaintiff's claims, there is no indication that the Army breached the Contract in failing to adjust plaintiff's coefficient. The FAR explains that "[a] fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies." 48 C.F.R. § 16.203-1(a); *see also Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States*, 87 Fed. Cl. 113, 124 (2009). For this purpose, the Contract incorporates AFARS 5152.237-9000, which provides that the economic price adjustment of the coefficient "will be based on the Building Cost Index (BCI) found in the Market Trend pages of the Engineering News Record (ENR)." Plaintiff provides no evidence that this clause was applied improperly here. Rather, its claim on this count is yet another variation on the theme that defendant should have adjusted the contract prices to reflect plaintiff's actual costs. The FAR, indeed, contains economic-price-adjustment clauses that

---

[12] *See Centex Corp.*, 395 F.3d at 1304; *Jay Cashman, Inc. v. United States*, 88 Fed. Cl. 297, 308 (2009); *Info. Sys. & Networks Corp. v. United States*, 81 Fed. Cl. 740, 750-51 (2008), *aff'd*, 356 Fed. Appx. 410 (Fed. Cir. 2009); *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 188 (2007).

[13] Plaintiff relies upon the warranty of specifications doctrine established in *United States v. Spearin*, 248 U.S. 132, 136 (1918), to contend that the Army "warranted that the non-negotiable UPB, which was part of the Contract and specifications required under the Solicitation, fairly and accurately reflected local rates for labor, materials, and equipment." *Spearin* "sets forth the rule that a contractor bound to build according to government plans and specifications is not responsible for the consequences of defects in those plans and specifications." *Holmes v. United States*, 657 F.3d 1303, 1315 (Fed. Cir. 2011). That doctrine, however, is limited to situations in which "the contractor is bound to build according to plans and specifications prepared by the owner." *Spearin*, 248 U.S. at 136; *see also Hercules, Inc. v. United States*, 24 F.3d 188, 197 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996). That is not the case here. The doctrine, moreover, does not apply where the contract's design specifications are fine and it is possible to perform the task identified – "[w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Spearin*, 248 U.S. at 136. That is the case here.

would have approximated that result, *see, e.g.*, 48 C.F.R. § 52.216-4.  But, contrary to plaintiff's claim, those clauses were not included in the Contract.

Lastly, plaintiff seeks reformation of the Contract based on a mutual mistake or a unilateral mistake.  This claim too must be rejected.

In order to make out a claim for mutual mistake, the party advocating reformation must prove four elements:  (i) the parties to the contract were mistaken in their belief regarding a fact; (ii) that mistaken belief constituted a basic assumption underlying the contract; (iii) the mistake had a material effect on the bargain; and (iv) the contract did not put the risk of the mistake on the party seeking reformation.  *See Bank of Guam v. United States*, 578 F.3d 1318, 1329-30 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct. 3468 (2010); *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 811 (1990)).  As these factors reflect, reformation for mutual mistake is available "'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.'" *Ind. Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 903-04 (7th Cir. 2002) (quoting Restatement (Second) of Contracts, § 155 cmt. a (1981)).[14]  Generally, the elements of a claim for reformation must be proven by clear and convincing evidence.  *See, e.g.*, *Phil. Sugar Estates*, 247 U.S. at 391 (stating that reformation will not be granted "unless the proof of mutual mistake be of the clearest and most satisfactory character"); *see also* 27 Williston on Contracts § 70:54 (4th ed.) (stating that "the preferred way of appraising the quantum of proof" in reformation cases "is to state quite simply that the evidence must be clear and convincing"); Restatement (Second) of Contracts § 155 cmt. c (1981).

Plaintiff has failed to produce evidence to support several of its claims on this theory.  For one thing, it has failed to support its assertion that there was any mistake of fact here, *i.e.*, "a belief that is not in accord with the facts." *Atlas*, 895 F.2d at 750; *see also Short Bros., PLC v. United States*, 65 Fed. Cl. 695, 796 (2005).  Principally, the record lacks support for plaintiff's claim that, in any comprehensive way, the prices in the Gordian Book failed to reflect local prices.  On this count, plaintiff primarily relies on the fact that its costs exceeded those in the Gordian Book, but this is proof neither that its costs were reasonable nor that there was any systematic problem with the prices in the book.  Rather, while the record suggests that some prices in the book may have been below market, plaintiff has provided no evidence, one way or the other, as to the accuracy of the wide majority of the prices in that book – having some degree of inaccuracy is not unusual when it comes to contracts of this sort, which necessarily anticipate some time delay between the issuance of a price guide and the performance of a particular task

---

[14] *See also Phil. Sugar Estates Dev. Co. v. Gov't of Phil. Islands*, 247 U.S. 385, 389 (1918) ("[i]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties"); *Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006).

order. Certainly, plaintiff has failed to provide any proof that the Gordian Book systematically understated the costs of labor, equipment and materials at the time the Contract was issued.[15] Indeed, the record reveals that plaintiff realized a profit in performing a large number of the task orders, suggesting that the prices as to the items, equipment and services associated with those orders were not below market.

Likewise, plaintiff has failed to support its claim that the Army mistakenly believed that Gordian had updated their book, when it had not. In fact, the Gordian firm did update their book in 2006, but focused only on what it called "material price indicators" and did not review all 70,000 prices therein. Moreover, to the extent that there were some prices in the Gordian Book that were low, the record contains admissions by plaintiff's officers that Lakeshore knew this was the case before it submitted its offer. Indeed, it appears that, prior to submitting that offer, plaintiff had: (i) been in contact with the prior contractor on this contract, who had likewise complained about the prices in the Gordian Book being low; and (ii) compared on a "side-by-side basis" the 2005 version of the Gordian Book with the 2006 version.[16]

---

[15] Plaintiff submitted an affidavit by one of its vice presidents claiming that the "prices in the Gordian Book were not accurate nor reflective of local prices for labor, materials, and equipment costs." The only specific information provided with this affidavit (principally dealing with increases in the price of steel), however, deals with price increases that occurred after the contract was issued. Moreover, plaintiff's damages expert made clear at his deposition that he made no comparisons of this sort, but rather simply assumed that plaintiff was entitled to the difference in the costs it incurred versus those reflected in the Gordian Book.

[16] In his deposition testimony, one of Lakeshore's officials indicated that before Lakeshore made its offer, a supervisor asked him to compare the 2005 version of the Gordian Book that the prior contractor had used on an earlier contract with the 2006 version of the Book:

> Q.:   So [the supervisor] basically told you that the 2005 UPB book was low?
>
> A.:   No, he didn't say it was low, he said that the other contractor was having difficulties executing the project, apparently, because of the spike in materials.
>
> So what he basically asked me to do was [to] get ahold of Gordian Group to see if we can purchase the book that that contractor had, and I said yeah. So we bought it . . . and just looked page by page. Okay, here's a price, did they do anything in the book? Did any of the unit prices go up?
>
> Q.:   Did they?

     Even if Lakeshore's proof is sufficient to create a genuine issue of material fact as to the existence of this mistake, it has failed to provide meaningful proof as to the remaining three prongs of the mutual mistake standard.  Contrary to its claims, there is no indication that the Contract presumed that all the prices in the Gordian Book were accurate.  Rather, as discussed above, the Contract placed on the contractor the risk that certain prices in that book might not be accurate – a risk that was to be managed either in the calculation of the coefficient or, presumably, in assessing the desired profitability on the Contract as a whole.[17]  In its bid proposal, plaintiff provided every indication that it understood this and had taken steps to assess the accuracy of the Gordian Book and approximate its impact.  That those efforts were misrepresented or incomplete – or that the particular tasks assigned to plaintiff proved, for some reason, to be unprofitable – is no basis for allowing plaintiff to reform the entire contract into which it freely entered.  Finally, it should not be overlooked that this fixed-price contract clearly placed the risk of any mistake regarding increased performance costs on the party seeking the reformation, *i.e.*, plaintiff.  *See Lindsay v. United States*, 41 Fed. Cl. 388, 391 (1998) (no reformation where solicitation placed burden on contractors to verify estimates of work); *Foley Co. v. United States*, 36 Fed. Cl. 788, 790 (1996) (no reformation where solicitation placed burden on contractors to verify whether project was exempt from state sale tax); *see also*

---

     A.:    Some did, some didn't.

     Q.:    And did you create spreadsheets or documents –

     A.:    It was more just –

     Q.:    – regarding your analysis?

     A.:    – on screen, looking at the two UPB's side-by-side and just some hand notes on some general stuff.  Looked like copper went up five percent or something.  It was very generic.

The official further testified that before plaintiff submitted its offer, he "compared the UPB major items that you would typically use in vertical construction," focusing, in part, on actual cost experience on past projects.

[17] Plaintiff attempts to pile a Pelion of conjecture upon an Ossa of speculation in relying on several emails it claims demonstrate that Army officials thought all the prices in the Gordian Book had been updated.  These emails primarily involve an internal debate about whether to use the price book/coefficient approach.  Nothing in this parol evidence has the effect of modifying the plain terms of the contract or the warnings in the Gordian Book, which, for the reasons discussed above, the court believes must be viewed as part of the Solicitation.

*McNamara Const. of Manitoba, Ltd. v. United States*, 509 F.2d 1166, 1168-69 (Ct. Cl. 1975).[18] Accordingly, plaintiff does not meet any of the prongs of the mutual mistake analysis and its claim in that regard must fail, as a matter of law.

To make a successful claim of unilateral mistake, Lakeshore must prove: (i) that the error is of the type that is compensable; and (ii) that the contracting officer knew or should have known of the contractor's unilateral mistake at the time the bid was accepted. *Bromley Contracting Co. v. United States*, 794 F.2d 669, 671-72 (Fed. Cir. 1986). Compensable claims include any "'clear cut clerical or arithmetical error, or misreading of the specifications.'" *Id.* at 672 (quoting *Ruggiero v. United States*, 420 F.2d 709, 713 (Ct. Cl. 1970)); *see also Aydin Corp. v. United States*, 669 F.2d 681, 686 (Ct. Cl. 1982). The Federal Circuit has clearly stated, however, that mistakes in judgment on the part of the contractor are not the types of mistakes that are compensable. *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed. Cir. 1987); *Bromley*, 794 F.2d at 672; *United States v. Hamilton Enters., Inc.*, 711 F.2d 1038, 1048 (Fed. Cir. 1983). And that, in the court's view, is precisely what we have here. *See Humlen v. United States*, 49 Fed. Cl. 497, 505 (2001); *Edwards v. United States*, 19 Cl. Ct. 663, 675-76 (1990); *Carrier Corp. v. United States*, 6 Cl. Ct. 169, 175 (1984).

## III.   CONCLUSION

The court will not gild the lily. Based on the foregoing, the court **GRANTS** defendant's motion for summary judgment. The Clerk is hereby ordered to dismiss plaintiff's complaint.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[18] While plaintiff does not invoke the doctrine specifically, it appears that some of its claims are based on what is known as the "superior knowledge doctrine." That doctrine "is a narrow exception to the general rule that contractors in a firm, fixed-price contract assume the risk of increased performance costs." *P&K Contracting, Inc. v. United States*, 108 Fed. Cl. 380, 395 (2012). The doctrine applies where the contractor:

> (1) undert[ook] to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 1071 (1992) (citation omitted). But, the facts in this case make clear that plaintiff has not met this threshold.